UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,            Case No. 25-cr-20479
                                            Hon. Matthew F. Leitman

                v.

CHENGXUAN HAN,

                Defendant.

_____/

## **MOTION TO SUPPRESS STATEMENTS**

Chengxuan Han moves to suppress all incriminating statements made during her custodial interrogations on June 8, 2025, as obtained in violation of her rights under the Fifth Amendment. There are two separate episodes of questioning that violated Ms. Han's rights:

First, Ms. Han made statements in response to incriminating questions posed by Customs and Border Patrol during a secondary inspection, before being given her *Miranda* rights. The nature of the questioning required *Miranda* warnings.

Second, after telling Ms. Han about her *Miranda* rights during a subsequent interrogation by Homeland Security, agents ignored her request for counsel and continued questioning her in violation of the Fifth Amendment. And although Ms. Han ultimately signed a waiver of her Fifth Amendment rights, she did not do so knowingly or voluntarily because the totality of the circumstances present during

the interrogation contributed to a coercive environment, including Han's age, language barrier, the interpreter's ineffectiveness, Han's repeated confusion and attempts to clarify when she has a right to a lawyer, the fact that Han had already undergone a long interrogation and had just arrived from a long flight in the United States for the first time, and cultural differences between the United States and China.

Han asks this Court to suppress both sets of statements and all ensuing fruits of the constitutional violations. The government does not concur.

## Conclusion

This Court should suppress the incriminating statements made by Han on June 8, 2025, and the ensuing fruits, as obtained in violation of the Fifth Amendment.

Respectfully submitted,

*s/*Sara Garber

s/Benton Martin

Federal Community Defender
Attorneys for Chengxuan Han
613 Abbott St., Ste. 500
Detroit, MI 48226
Phone: (313) 967-5843
Email: sara_garber@fd.org

Date: August 7, 2025

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,             Case No. 25-CR-20479
                                        Hon. Matthew F. Leitman

                v.

CHENGXUAN HAN,

                Defendant.

_____/

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Chengxuan Han asks this Court to suppress all incriminating statements she made on June 8, 2025: First, during an interview with Customs and Border Patrol agents, because she was not provided the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and second, during an interview with a Homeland Security Agent, because she invoked her right to counsel and did not knowingly and voluntarily waive her Fifth Amendment rights.

## Factual Background

### *Ms. Han's Academic Background and Research*

Ms. Chengxuan Han arrived in the United States for the first time on June 8, 2025, via a Delta flight to Detroit. Ms. Han is a doctoral student in her fifth year of

1

study towards earning her PhD in biology from the College of Life Science and Technology at Huazhung University in China. Ms. Han's primary area of research is on the intersection of neuroscience and physiology, specifically, how organisms detect sensory cues such as light, touch, and temperature, and how the neural circuits and synapses process sensory information to produce behavioral output. In conducting her research, she and others in her field, routinely conduct experiments on a microscopic biological organism, a nematode worm, known by the name Caenorhabditis Elegans (C. Elegans). Ms. Han has authored multiple research papers on C. Elegans.[1] The research of Ms. Han and others into the response of C. Elegans to different environmental stimuli has implications for important areas of scientific research, such as how environmental factors impact longevity, aging, and health.[2]

C. Elegans is a non-hazardous, non-infectious, non-pathogenic, non-parasitic organism.[3] It is small, growing to about 1 mm in length, and lives in the soil— especially in rotting vegetation—in many parts of the world, including the United

---

[1] Xu, Lingxiu, et al*., Temporally controlled nervous system-to-gut signaling bidirectionally regulates longevity in C. elegans*, eLife (2024), https://perma.cc/R35S-8LUM; Tianlin Zheng, et al., *Cytoplasmic and mitochondrial aminoacyl-tRNA synthetases differentially regulate lifespan in Caenorhabditis elegans*, iScience 25, 105266 (2022), https://perma.cc/PBN3-EAN7.

[2] Philip Meneely, et al., *Working with worms: Caenorhabditis elegans as a model organism. Current Protocols Essential Laboratory Techniques*, 19 Protocol, e35 (2019), currentprotocols.onlinelibrary.wiley.com/doi/10.1002/cpet.35.

[3] Mark Edgley, What is Caenorhabditis elegans and why work on it? - Caenorhabditis Genetics Center (CGC) - College of Biological Sciences, https://perma.cc/VBN9-UVEH.

States.[4] Since its introduction as a laboratory organism 50 years ago, C. Elegans has become one of the most widely used and versatile models for nearly all aspects of biological and genomic research.[5] C. Elegans is easy to obtain, easy to study, non-harmful, and has qualities that make it useful for a wide-variety of biology research.[6]

As part of her PhD research, Ms. Han was offered a visiting scholar position, to work with Xianzhong (Shawn) Xu, a professor at the Life Sciences Institute at the University of Michigan. Her plan was to further her research at the University of Michigan lab and then return to China to defend her dissertation in September 2026. Ms. Han was granted permission to come to the United States and given a J1 visit for this research.

In furtherance of her research, Ms. Han is alleged to have mailed packages of research samples to the United States prior to her arrival. Ms. Han is charged with shipping these samples in knowing violation of U.S. customs law and with the intent to defraud the United States. Dkt. 16. She is further charged with lying to agents who questioned her at the airport upon her arrival. Dkt. 16. Ms. Han denies these allegations.

---

[4] *Id.*
[5] Meneely, Working with Worms, *supra*.
[6] *Id.*

***Ms. Han's Interrogation by Customs and Border Patrol***

Upon her arrival to the United States on June 8, 2025, Ms. Han was seized at customs and referred for a Tactical Terrorism Response Team (TTRT) inspection conducted by Customs and Border Patrol. (Ex. A, Report, USA 154-157.) Ms. Han had been flagged by the Treasury Enforcement Communications System (TECS) prior to her arrival in the United States because of shipments associated with her name made from China containing C. Elegans and other biological material. (*Id.*) In particular, the United States had seized and flagged multiple packages of biological materials believed to be sent by Ms. Han back in September and October 2024, and March 2025. (*Id.*)

After reviewing the intelligence information gathered about the packages, Customs and Border Patrol conducted an interrogation of Ms. Han that lasted about two and a half hours in total.[7] The interview was conducted in English with a Mandarin Chinese translator. Ms. Han was in custody and not free to leave.

During the first half-hour of the interrogation, officers inspected Ms. Han's luggage and asked her questions about its contents. (Exs. D, E.) The remainder of the interrogation focused exclusively on the packages Ms. Han had previously sent

---

[7] A video of this interview, Exhibit B, along with a transcription of the video, Exhibit C, will be submitted to this Court in conjunction with a simultaneously filed motion to submit video exhibit.

to the United States: their contents, what she did or did not disclose to the carrier prior to sending them, the package recipients, and who asked her to mail the packages, and why. (Exs. D, E.)

It is clear the officer interviewing Ms. Han was aware of these shipments prior to her arrival and intended to question Ms. Han about them. For example, Officer Hamika repeatedly questioned Ms. Han about the meaning of "plastic plates" (what the government contends was listed on the carrier's manifest for one of the packages). (Ex. E, CPB Interview, at 10–11.) The officer remarks that the true contents of the packages were a "petri dish." (*Id.* at 11.) He accuses Ms. Han of lying, with statements like: "I work for Customs and Border Protection. What was really in the package?" (*Id.* at 10.) He told her, "Nobody believes you," and "I want the truth." (*Id.* at 18, 20.) And he told her: "Nobody believes you. It is a terrible story. Nobody believe her, She doesn't believe herself. She's still lying." (*Id.* at 23.)

This evidence suggests that the purpose of the Border Patrol officers' questioning of Ms. Han on June 8, 2025, was not to determine Ms. Han's eligibility to enter the United States. The tone and content of officer Hamika's questions during the majority of the interrogation, lie in stark contrast to the first half hour, where Officer Hamika asks more general questions about Ms. Han's background and academic plans, and made general inquiries about her luggage. Additionally,

5

Homeland Security Agent Ratterman revealed during a subsequent interrogation of Ms. Han (Exs. B, C[8]), that authorities had predetermined that Ms. Han would not be allowed into the country based on the previously shipped packages. Agent Ratterman informed Ms. Han during his subsequent custodial interview that "[b]ecause we are aware of the smuggling attempt, you are not coming into the United States today" and "no matter what" you are being arrested. (Ex. C, HSI Interview, at 4.)

Importantly, Ms. Han was not provided with *Miranda* warnings prior to or at any time during her interrogation by Customs and Border Patrol. This, as more fully articulated below, was a violation of Ms. Han's Fifth Amendment rights. This interrogation was conducted in furtherance of a criminal investigation into the alleged smuggling of materials into the United States, and thus, *Miranda* warnings were required.

### Ms. Han's Interrogation by Homeland Security

After the Border Patrol interrogation, officers handed Ms. Han over to be interrogated by officers from Homeland Security, including Agent Ratterman.

---

[8] A video of this interview, Exhibit B, along with a transcription of the video, Exhibit C, will be submitted to this Court in conjunction with a simultaneously filed motion to submit video exhibit.

Ms. Han remained in custody and was not free to leave. This interrogation was also conducted in English with a Chinese translator.[9]

At the outset of the interrogation by Homeland Security, for the first time, Agent Ratterman told Ms. Han about her *Miranda* rights. In Mandarin Chinese, after being read her Miranda rights, Ms. Han told the agent, "I don't quite understand the US laws. I also don't understand what I have done wrong. Therefore, I want to have a lawyer present so I can consult." (Ex. C, HSI Interview, at 3.) The interpreter translated Ms. Han's statement: "She says she wants a lawyer, as she doesn't know the laws, the US laws, she doesn't know what she was wrong." (*Id.*) Rather than stopping the interview at the invocation of Ms. Han's request for counsel, Ratterman continued interrogating Ms. Han, asking her incriminating questions about the shipment of the packages. (*Id.* at 3–36.) The questioning continued for roughly another two hours. As articulated in more detail below, this interrogation violated Ms. Han's Fifth Amendment rights because law enforcement interrogated Ms. Han in furtherance of a criminal investigation after she invoked her right to counsel.

---

[9] A video of this interview, Exhibit D, along with a transcription of the video, Exhibit E, will be submitted to this Court in conjunction with a simultaneously filed motion to submit video exhibit.

## ARGUMENT

**I.  Ms. Han's Fifth Amendment Rights were Violated when she was Subjected to a Custodial Interrogation by Customs and Border Patrol without Having Been Given *Miranda* warnings.**

### A. Standard

The Fifth Amendment to the United States Constitution provides in part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." When police interrogate a suspect in custody, the "inherently coercive" environment created by custodial interrogation may allow officers to extract a confession in spite of the privilege. *New York v. Quarles*, 467 U.S. 649, 654 (1984). Under *Miranda*, a person has the right to remain silent and their right to consult with an attorney whenever they are (1) interrogated (2) while in custody – and they should be warned accordingly. *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). "Interrogation" comprises all "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). Interrogation occurs when police engage in words or actions they "should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

Whether someone is in "custody" generally depends on whether the police have restricted his "freedom of action in any significant way." *Miranda*, 384 U.S. at 444. The relevant inquiry is whether a "reasonable person [would] have felt he or she was

8

not at liberty to terminate the interrogation and leave.'" *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

### B. *Miranda* **applies at the border.**

Some level of routine questioning is to be expected at the border, and *Miranda* does not apply in those interactions. *United States v. Galloway*, 316 F.3d 624, 631 (6th Cir. 2003). As soon as the investigation has "focused" though—that is, officers develop probable cause to believe the person questioned has committed a crime and continue asking questions, or otherwise seek evidence only to support a criminal offense, the questioning constitutes a custodial interrogation. *Id.* (quoting *Chavez-Martinez v. United States*, 407 F.2d 535, 539 (9th Cir. 1969)); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 883-84 (S.D. Ohio 2016) (summarizing cases). In sum, once questioning goes beyond a routine border stop, the traveler's *Miranda* rights kick in.

Courts deciding whether questioning was routine look to "the content of the officer's questions," which "in the context of an interrogation at the border, may be the single most important factor for determining whether a traveler is in custody." *United States v. Sultanov*, 742 F.Supp.3d 258, 302) (E.D. N.Y. 2024). For example, questions unrelated to a routine stop are evidence of a custodial interrogation. *United States v. Jimenez-Robles*, 98 F.Supp.3d 906 (E.D. Mich. 2015) (collecting cases).

9

Even "basic background questions" that bear on admissibility may warrant *Miranda* warnings beforehand, at least when officers know "those questions are reasonably likely to elicit incriminating information about a particular offense." *Pacheco-Alvarez*, 227 F.Supp.3d at 884.

Here, after the first thirty minutes of the border patrol interrogation involving Han, the officers *only* asked Han about the packages she had previously sent to the United States: their contents, what she did or did not disclose to the carrier as to the contents of the packages, the package recipients, and who asked her to mail the packages, and why. (Ex. E, CPB Interview, at 9–26.) Officer Hamika accused Han of lying, with statements like: "I work for Customs and Border Protection. What was really in the package?" (*id.* at 10), "Nobody believes you," (*id.* at 18), "I want the truth." (*id.* at 20), and "Nobody believes you. It is a terrible story. Nobody believe her, She doesn't believe herself. She's still lying" (*id.* at 23). The tone and content of these questions lie in stark contrast to the first half hour, where Hamika asked more generally about Han's background and academic plans, and made general inquiries about her baggage. (*Id.* at 1–8.)

The CBP officers' questioning about the packages is the kind of "focused" investigation into known alleged criminal activity that requires *Miranda* warnings. The questioning of Ms. Han about the shipments that form the basis of this case were

10

clearly designed to elicit incriminating responses about an ongoing criminal investigation. The officer's tone took on a "distinctly accusatory level" that courts have found likely to indicate a custodial interrogation. *United States v. Phillips*, 812 F.3d 1355, 1360 (11th Cir. 1987).

Moreover, the questions asked during Ms. Han's were not posed to assess her admissibility into the country. Instead, authorities had predetermined prior to her interrogation that Ms. Han would not be allowed into the country and would be criminally charged based on the prior shipment of packages. (Ex. C, HSI Interview, at 4.) Regardless of Ms. Han's answers, Customs and Border Patrol was going to bar her entry and facilitate her arrest. (*Id.*)

"[I]mmigration officers cannot avoid *Miranda*'s requirements 'simply by labeling immigration inquiries as 'civil' or 'administrative.'" *Pacheco-Alvarez*, 227 F. Supp. 3d at 886 (quoting *Jimenez–Robles*, 98 F.Supp.3d at 912). The dispositive issue is whether law enforcement knew enough about Ms. Han to foresee that his questioning could elicit incriminating responses. *Id.* The tone, repetition, and pointed subject of the questions by Border Patrol agents shows that not only could they reasonably foresee this, but this was the intent of the interrogation.

Compare this case to the First Circuit's decision in *Molina-Gomez*, 781 F.3d at 22–23. There, border patrol officers became suspicious of Molina-Gómez during

11

initial questioning upon his return from Colombia and escorted him to an interview room. During the secondary interview, they questioned him about his trip and potential drug trafficking for roughly two hours. *Id.* at 16. This questioning, the court explained, "was not 'routine,'" as the officers "were no longer probing whether or not to admit Molina into the country," but instead "were probing their suspicions of Molina's involvement with drug smuggling activity." *Id.* at 23. The encounter "went above and beyond a routine Customs inspection to determine whether or not Molina should be admitted into the United States" and constituted custodial interrogation under *Miranda*. *Id.*

Similarly, here, CBP officers sequestered Ms. Han in an interview room, seized her electronic devices and her luggage and asked her interrogating questions likely to lead to incriminating responses about alleged criminal activity they were aware of prior to her arrival at the border. According to *Galloway*, 316 F.3d at 631, a traveler's responses to such questions are inadmissible if the traveler did not first receive *Miranda* warnings.

Moreover, as *Galloway* and *Molina-Gomez* demonstrate, this Court should consider the amount of time that officers held and questioned Ms. Han. In *Galloway*, where the Sixth Circuit found no Fifth Amendment violation, the entire detention lasted "only seven to ten minutes," during which time the defendant and another

12

individual were questioned. 316 F.3d at 631. In *Molina-Gomez*, in contrast, the traveler was held for between one-and-a-half and two hours, and the court found a *Miranda* violation. 781 F.3d at 22. The First Circuit emphasized that, "the longer someone is detained, the more likely he is in custody." *Id.* (quoting *United States v. Pratt*, 645 F.2d 89, 91 (1st Cir. 1981)).

Here, Ms. Han did not receive *Miranda* warnings until a subsequent interrogation done by the FBI (addressed below). This was over four hours after she was first approached CBP officers. Moreover, it is clear that prior to interrogating Ms. Han, CBP officers were well-aware of the packages she was alleged to have shipped, their contents, and the evidence held by the government, including what was listed by the carrier on the manifest and other purportedly incriminating information. (Ex. A, HSI Report.) Prior to interrogating Ms. Han, these officers appeared to have consulted internal records, the FBI, and the Department of Homeland Security and concluded that Ms. Han had committed a smuggling offense, well before their extensive questioning of her about her potential criminal activity. (*Id.*; Ex. C, HSI Interview, at 4, Ex. E, CPB Interview, at 8.) These actions went far beyond a routine customs inspection.

Just half an hour into the secondary inspection, the CBP officers established the basics: Han's visa status, and purpose for travel. (Ex. E, CPB Interview, at 1–8.)

13

Yet for an hour and a half more, they continued to detain her and press her with questions targeted to elicit incriminating responses about the packages shipped many months prior. (*Id.* at 8–26.) The officers' failure to advise Han of her constitutional rights under *Miranda*—warnings she later proved responsive to when she promptly invoked her right to an attorney (Ex. C, HSI Interview, at 3)—amounted to a Fifth Amendment violation. As a result, any statements made by Ms. Han in response to these questions should be suppressed.

## II. Ms. Han's Fifth Amendment Rights Were Violated when Homeland Security Agents Continued Interrogating her after she Invoked her Right to Counsel.

After a suspect has received her *Miranda* warnings and invokes her right to counsel, police may not initiate an interrogation of the suspect without counsel present. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Law enforcement must "scrupulously honor" an invocation of *Miranda* rights. *Michigan v. Mosley,* 423 U.S. 96, 103 (1975). "In other words, regardless of whether police are interrogating a suspect in custody or of whether the suspect has waived his *Miranda* rights, police must respect that suspect's invocation of his Fifth Amendment rights to remain silent or to counsel." *Tolliver v. Sheets*, 594 F.3d 900, 917 (6th Cir. 2010).

This rule is designed to prevent situations where authorities through "badgering or overreaching—explicit or subtle, deliberate or unintentional—might

14

otherwise wear down the accused and persuade [the suspect] to incriminate himself." *Smith v. Illinois*, 469 U.S. 91, 98 (1984). For that reason, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation." *Edwards*, 451 U.S. at 484; *accord Smith*, 469 U.S. at 98. To this end, an officer may not even ask clarifying questions about whether the suspect wants counsel once the suspect has unequivocally invoked his right. *Davis v. United States,* 512 U.S. at 461–62 (1994).

Simply put, if a suspect "requests an attorney, questioning must cease." *Davis*, 512 U.S. at 461.

Here, at the outset of her interrogation by Homeland Security, Ms. Han unequivocally asked for a lawyer. As Ms. Han is being explained her Miranda rights, she says in Mandarin Chinese: "I don't quite understand the US laws. I also don't understand what I have done wrong. Therefore, I want to have a lawyer present so I can consult." (Ex. C, HSI Interview, at 3.) The interpreter then tells the agent in English, "She says she wants a lawyer, as she doesn't know the laws, the US laws, she doesn't know what she was wrong." (*Id.*)

The agent did not immediately cease talking to Han as after she invoked her right to counsel. There was no break in the custodial interrogation. Much to the contrary, the agent proceeded to interrogate Ms. Han about the shipments. The

15

Agent's immediate response to Ms. Han's request for a lawyer was: "The United States government is aware that either you or someone using your information has shipped packages to the United States, OK? (Ex. C, HSI Interview, at 3.) This was an incriminating question, designed to illicit an inculpatory response, presented to Ms. Han after she asked for a lawyer. *See United States v. Hamilton*, No. 24-20357, ECF No. 29, Order Granting Suppression, PgID 129–32 (E.D. Mich. Apr. 7, 2025) (finding the question "Cuz you you you know that you've done like a lot of violations of your probation, right?" constituted a question reasonably likely to elicit an incriminating response in the context of an arrest).

Ms. Han ultimately agreed to sign the *Miranda* waiver and speak to the agent. However, this was only after she invoked her right to counsel and the agent continued questioning her in violation of her Fifth Amendment Rights. Ms. Han's Fifth Amendment Rights were violated when Homeland Security Agents continued interrogating her after she invoked her right to counsel, and as such, the entirety of her statement should be suppressed.

### III.    Ms. Han Did Not Knowingly and Voluntarily Waive her *Miranda* Rights.

If the Court does not agree that Ms. Han's invocation of the right to counsel is dispositive in this case, in light of her subsequent signing of the *Miranda* waiver, Ms. Han contends that the government cannot show that Ms. Han effectively waived

16

her *Miranda* rights. Before an accused's confession to law enforcement obtained in a custodial interrogation can be introduced against them at trial, the government must prove by a preponderance of the evidence that the accused made a knowing and voluntary waiver of his or her rights after receiving *Miranda* warnings. *Berghuis v. Thompkins,* 560 U.S. 370, 382 (2010). To show that a suspect waived *Miranda* rights, the government must demonstrate that the suspect understood those rights before waiving them. *Wesson v. Shoop*, 17 F.4th 700, 704 (6th Cir. 2021).

In determining whether a suspect made a valid waiver, courts must consider the totality of the circumstances, including the suspect's "age, experience, education, background, and intelligence," and evaluation of whether the suspect had "the capacity to understand the warnings." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *accord United States v. Barahona-Sales,* 524 F. App'x 235, 238 (6th Cir. 2013).

Prior to signing the Miranda waiver, a number of factors were present during the interrogation of Ms. Han that contributed to a coercive environment: Han's age, language barrier, the interpreter's ineffectiveness,[10] Han's repeated confusion and attempts to clarify when she has a right to a lawyer, the fact that Han had already undergone a long interrogation and had just arrived from a long flight in the United

---

[10] Mistranslations and interpreter confusion can be seen throughout both videos as noted in Exhibits C and E.

17

States for the first time, and cultural differences between the United States and China. *United States v. Sultanov,* 742 F. Supp. 3d 258, 306 (E.D.N.Y. 2024) (finding, based on the totality of the circumstances, including language barrier, that the government had not met burden of proving that suspect knowingly waived his *Miranda* rights).

As Ms. Han is being explained her Miranda rights, for example, it is clear that she is confused about when her right to a lawyer arises. She starts by asking, "if she wants a lawyer, she can call right now?" (Ex. C, HSI Interview, at 2.) The agent responds: "If you want a lawyer present with you when we talk to you, that's fine, OK? However, that's not gonna happen tonight." (*Id*.) The agent goes on to say: "We will proceed with this investigation. At a later time, when we talk to you about it, you can have a lawyer present with you at that point of time." (*Id.* at 3.) These statements suggested to Ms. Han that her right to a lawyer was not available to her at this time, but only at a future time period. This is consistent with Chinese culture and legal practices, where an accused person has a right to a lawyer, but not at the time of interrogation and only later after they have fully cooperated by answering questions.[11]

---

[11]"Under Chinese law the right to counsel does not include the right to have counsel present during interrogation. When being informed of the right to counsel at the first interrogation, the suspect has no choice but to wait until the interrogation is over before he can find a lawyer." Yue Ma, *The*

18

Ms. Han subsequently asks in Chinese: "Can he provide me a lawyer now?" (Ex. C, HSI Interview, at 3.) She then invokes her right to a lawyer clearly as discussed above, saying: "I don't quite understand the US laws. I also don't understand what I have done wrong. Therefore, I want to have a lawyer present so I can consult." (*Id.*)

As discussed above, the agent did not immediately cease talking to Han after she invoked her right to counsel and the agent proceeded to interrogate Ms. Han about the shipments and to pressure Ms. Han to continue talking without a lawyer until she ultimately signs the waiver. This waiver, however, was not knowing or voluntary.

The agent in an effort to secure Ms. Han's waiver of her Miranda rights goes on to tell Ms. Han that he wants to hear "her story" and "people talk to people and lawyers talk to lawyers. OK?" (Ex. C, HSI Interview, at 4.) The agent also goes on to tell Ms. Han that there will be a significant delay before she can get a lawyer and that she will have to be arrested and see a judge first. (*Id.* at 4–5.) This, importantly, is mistranslated by the interpreter who tells Ms. Han in Chinese that she will only get a lawyer if she talks to the agent first. (*Id.* at 5.) This back and forth and the

---

*Amended Criminal Procedure Law of China: The Powers of the Police and the Rights of Criminal Suspects*, 53 No. 5 Crim. Law Bulletin ART 1 (2017).

19

resulting confusion as to the timing of her right to a lawyer, continues for many minutes before Ms. Han ultimately agrees to speak to the officers and sign the *Miranda* waiver.

As further evidence of Ms. Han's confusion, and the agent's coercive tactics, Ms. Han again asks at the end of the interview if she can ask for legal assistance. (Ex. C, HSI Interview, at 37.) The agent tells her, "You will have the opportunity to make a phone call in jail." (*Id.*)

The totality of the questioning of Ms. Han, coupled with her exhaustion, the language and cultural barriers, and her repeated attempts to request a lawyer that were tactically discouraged by the agent, and obfuscated by the agent and the interpreter, contributed to her lack of a full understanding of her rights. Ms. Han, under the circumstances, cannot be said to have made a knowing and voluntary waiver and her *Miranda* rights, and thus, this Court should suppress her statements.

## **<u>Conclusion</u>**

Ms. Han respectfully requests this Court find that her Fifth Amendment rights were violated by both the CBP and HSI interviews on June 8, 2025, and suppress her statements and the ensuing fruits of those statements.

Respectfully submitted,

*s*/Sara Garber

s/Benton Martin

Federal Community Defender
Attorneys for Chengxuan Han
613 Abbott St., Ste. 500
Detroit, MI 48226
Phone: (313) 967-5843
Email: sara_garber@fd.org

Date: August 7, 2025

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,               Case No. 25-cr-20479

v.                               Hon. Matthew F. Leitman

CHENGXUAN HAN,

        Defendant.

_____/

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2025, I electronically filed the foregoing

paper with the Clerk of the Court using the ECF system which will send notification

to opposing counsel.

                              *s/*Benton C. Martin

                              Federal Community Defender
                              Attorneys for Chengxuan Han
                              613 Abbott St., Ste. 500
                              Detroit, MI 48226
                              Phone: (313) 967-5832
                              Email: benton_martin@fd.org

Date: August 7, 2025

22